**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| LUCIA ANA LOPEZ, | ) | |
| | ) | Case No: |
| Plaintiff, | ) | |
| | ) | Judge |
| v. | ) | |
| | ) | |
| TRANS UNION LLC, | ) | |
| | ) | |
| Defendant. | ) | |

**VERIFIED COMPLAINT**

Lucia Ana Lopez ("Plaintiff") brings this action against defendant Trans Union LLC ("Trans Union" or "Defendant") as follows:

**PRELIMINARY STATEMENT**

1.     Plaintiff brings this action against Defendant for damages resulting from its violations of the Fair Credit Reporting Act, 15 U.S.C. § 1681 ("FCRA").

2.     "Inaccurate credit reports directly impair the efficiency of the banking system, and unfair credit reporting methods undermine the public confidence which is essential to the continued functioning of the banking system." 15 U.S.C. § 1681 (a)(1). "Consumer reporting agencies have assumed a vital role in assembling and evaluating consumer credit and other information on consumers." 15 U.S.C. § 1681 (a)(3). "There is a need to ensure that consumer reporting agencies exercise their grave responsibilities with fairness, impartiality, and a respect for the consumer's right of privacy." 15 U.S.C. § 1681 (a)(4).

3.     Consumer reporting agencies are to "[]adopt reasonable procedures for meeting the needs of commerce for consumer credit, personnel, insurance, and other information in a manner

which is fair and equitable to the consumer, with regard to the confidentiality, accuracy, relevancy, and proper utilization of such information …" 15 U.S.C. § 1681 (b).

4.       A credit entry may be inaccurate within the meaning of the FCRA because it is patently incorrect, or because it is misleading in such a way and to such an extent that it can be expected to adversely affect credit decisions.

**A.       The CFPB questions whether the National Credit Reporting Agencies are willfully failing to investigate consumer disputes.**

5.       The Consumer Financial Protection Bureau ("CFPB") and the Federal Trade Commission ("FTC") are the federal agencies with the principal responsibility for enforcing the FCRA. Exhibit A (January 2022 Annual report of credit and consumer reporting complaints). The CFPB also has rule writing authority under the FCRA, and supervisory authority over many of the key institutions in the consumer reporting system. Id. "Under the FCRA, the CFPB must submit an annual report to Congress regarding information gathered by the CFPB about certain complaints it transmits to the [National Credit Reporting Agencies] ("NCRAs")" Id. at P. 7.

6.       "In addition to meeting the FCRA reporting requirement, this report … [is] to provide the public with important context about the consumer reporting marketplace." Id.

7.       NCRAs "have additional dispute handling responsibilities. When consumers believe there is inaccurate information in their credit report, the FCRA enables consumers to dispute the information." Id. at P 12. "The FCRA provides consumers with dispute rights and imposes obligations on both the NCRAs and furnishers to ensure that potential errors are investigated and corrected promptly." Id. the NCRAs "must satisfy legal requirements when information is disputed … if a consumer disputes with the CRA the completeness or accuracy of an item of information, the CRA has an obligation to conduct a reasonable investigation." Id. "A

CRA is not required to investigate a dispute if the CRA has reasonably determined that the dispute is frivolous or irrelevant but must notify the consumer of its determination." Id.

8. "The NCRAs … do not take available steps to distinguish between complaints authorized by the consumer and those not authorized by the consumer. Instead, the NCRAs use proxies to identify complaints they suspect, though have not confirmed, were submitted by a third party." Id. at P. 28. "The NCRAs then use this speculative assessment to justify not responding to the issue(s) raised in a complaint." Id.

9. "The CFPB would expect the NCRA to review and substantively respond to the complaints" in every scenario. Id. at pp. 28-29. It is "difficult to reliably distinguish complaints that are submitted by a consumer acting on their own from those submitted without the consumer's knowledge or from hybrid situations in which the consumer plays a role in the submission but is assisted by a third party without contacting the consumer." Id. at p. 29.

10. The CFPB receives "a large volume of complaints where the consumer identifies their primary issue as *Problem with a credit reporting company's investigation into an existing problem*—e.g., problems with the results, or lack of results, from a prior dispute." (emphasis included in original). Id. at P. 33. The frequency of this type of complaint is quickly rising. Id. at pp. 33-34.

11. The CFPB tracked the "real (and sometimes, costly) consequences" caused when attempting to correct information on a credit report.

- Consumers are frustrated by a dispute process that does not work for them;

- Consumers are stressed when their attempts to correct inaccurate information goes unanswered;

- Consumers spend time and money trying to resolve their issues;

- Consumers discovered that debts they were unaware of had been furnished to their credit report;

- Consumers reported of a lengthy back and forth process to solve identity theft issues;

- Consumers are caught between furnishers and the NCRAs;

- Consumers simply give up on the process because they think they've done everything in their power. (Id. at pp. 34-38).

12.    "Around April 2020, approximately half of covered complaints received a response in which the NCRAs indicated a suspicion of third-party involvement and stated no further action would be taken." Id. at P. 46

13.    "A NCRAs mail process is described as employees reviewing submissions for a variety of characteristics to determine whether it qualifies as 'suspicious.'" Id. at P. 47.

14.    "Similarly, NCRAs review complaints to determine if they meet the criteria of a credit repair organization." Id.

15.    "These changes were initiated by the NCRAs without providing notice to the CFPB." Id.

16.    "The CFPB expects companies to provide complete, accurate, and timely responses to complaints, including complaints where the NCRAs have an obligation to do so under FCRA Section 611(e)." Id. at P. 50. "The information contained in the third-party template and the referred to dispute channel template does not meet these expectations." Id.

17.    "By mid-2020, however, all three NCRAs closed their complaints in fewer than 10 calendar days." Id. at P. 51. "This decrease in processing time is consistent with the increased use of template responses." Id.

18.    "At least one NCRA testified to Congress that it is responding completely and accurately to complaints transmitted by the CFPB. The CFPB's complaint analysis concludes otherwise." Id. at P. 55.

19.    "In what has been a record period of credit or consumer reporting complaint volume, the CFPB's analysis reveals that the NCRAs are closing complaints faster and with fewer instances of relief." Id. "The NCRAs discard most complaints based on unsubstantiated conclusions of suspected third-party involvement and on a flawed application of guidance." Id.

20.    "The NCRAs' responses to [complaints from the CFPB] raise serious questions about whether they are unable—or unwilling—to comply with the law." Id. at P. 55.

**B.    Under the FCRA, a consumer can dispute the completeness or accuracy of any item contained in a consumer's credit file and the CRA is obligated to involve the entity supplying the CRA with the challenged item.**

21.    One of the most critical protections provided by the FCRA is the consumer's right to dispute the accuracy or completeness of any item of information in their file. 15 U.S.C. § 1681i(a)(1)(A).

22.    "After all, the very purpose of the investigation [under the FCRA] is to determine whether an inaccuracy exists." *Whiting v. Harley-Davidson Fin. Servs.*, 534 F. Supp. 2d 823, 831 (N.D. Ill. 2008) (Shadur, J.).

23.    The CRA is to provide "prompt notice of dispute to furnisher of information." 15 U.S.C. § 1681i(a)(2).

24.    Within five business days of receipt of a notice of dispute from a consumer, the CRA must provide a notice of the dispute to any person who furnished any item of information in

dispute. The only exceptions are if the CRA has determined the dispute to be frivolous, irrelevant, or has deleted the disputed information pursuant to an expedited dispute resolution process. 15 U.S.C. § 1681i(a)(2)(A).

25.     Once a CRA determines that a credit item is inaccurate, incomplete, or cannot be verified the CRA must promptly delete or modify that information, as appropriate. 15 U.S.C. § 1681i(a)(5).

26.     A CRA may terminate an investigation if it determines a consumer dispute is frivolous or irrelevant. 15 U.S.C. § 1681i(a)(3)(A). If the CRA makes such a determination, the CRA must notify the consumer not later than 5 business days after making such determination. 15 U.S.C. § 1681i(a)(3)(B).

27.     "In general, a CRA shall provide written notice to a consumer of the results of a reinvestigation … not later than 5 business days after the completion of the reinvestigation." 15 U.S.C. § 1681i(a)(6)(A).

28.     A furnisher of information to the CRAs has a duty to correct and update information it determines "is not complete or accurate" and provide the CRA "any corrections to that information, or any additional information, that is necessary to make the information provided by the person to the agency complete and accurate." 15 U.S.C. § 1681s-2(a)(2).

29.     "If the completeness or accuracy of any information furnished by any person to any consumer reporting agency is disputed … by a consumer, the person may not furnish the information to any consumer reporting agency without notice that such information is disputed by the consumer." 15 U.S.C. § 1681s-2(a)(3).

## JURISDICTION

30.     Jurisdiction is proper under 28 U.S.C. § 1331, and 15 U.S.C. § 1681p (FCRA) as this action arises under the laws of the United States.

31.     Venue is proper in this District pursuant to 28 U.S.C. § 1391 as the sole Defendant in this case resides in this district.

## PARTIES

32.     Plaintiff is a natural person who resides in Wellington, Florida.

33.     Defendant Trans Union is an Illinois limited liability corporation with its principal place of business located at 555 West Adams Street, Chicago, IL 60661. Its registered agent, Prentice Hall Corporation is located at 801 Adlai Stevenson Drive, Springfield, IL 62703.

34.     Trans Union is a credit reporting agency that compiles and maintains files on consumers on a nationwide basis for the purpose of furnishing consumer reports to third parties bearing on a consumer's credit worthiness, credit standing, or credit capacity.

## FACTS

35.     While trying to qualify to refinance her mortgage before interest rates began to rise, Plaintiff learned that there were errors on Plaintiff's Trans Union credit report. Namely, it contained derogatory accounts in which Plaintiff was merely an Authorized User.

36.     Plaintiff was also denied credit while trying to lease a car due to charge offs on her credit report that did not belong to her.

37.     Plaintiff is paying a higher interest rate on an auto lease because of derogatory authorized user accounts on her Trans Union credit report.

38.     Plaintiff's Trans Union credit report contains derogatory information as to a Barclays credit card that is closed, charged-off and has a past due balance of $11,139 ("Barclays

Account"). Plaintiff had no account with Barclays. Instead, she was merely an authorized user with no obligations or responsibilities to pay Barclays. Plaintiff has never used the Barclays Account.

39.     Plaintiff's Trans Union credit report contains derogatory information as to a Macy's revolving credit card that was "settled for less than full amount" and is listed as a charge off/collection ("Macys Account"). Plaintiff had no account with Macys. Instead, she was merely an authorized user with no obligations or responsibilities to pay Macys. Plaintiff has never used the Macys Account. Plaintiff never "settled for less than full amount" with Macys about this account.

40.     Plaintiff has not agreed to any terms with Barclays or Macys as to these accounts. Any derogatory information is not due to her own fault and should not negatively impact her credit worthiness.

41.     For example, if Plaintiff wanted to discharge any debts owed to Barclays or Macys through a bankruptcy, she would not be able to as they are not her debts.

42.     The reporting of derogatory accounts on an authorized user's credit report, even if the account lists the information as authorized user, is misleading to potential creditors. Plaintiff's own Trans Union credit reports expressly states on the report itself that these derogatory accounts are impacting her credit score.

43.     Plaintiff wrote a detailed dispute letter about the Barclays and Macys Accounts to Trans Union via USPS certified mail tracking info: 9407 1118 9956 0894 0975 82.

44.     The USPS shows Plaintiff's dispute letter was received by Trans Union on November 24, 2021.

45.     Plaintiff never heard back from Trans Union in response to Plaintiff's dispute letter.

46. Upon information and belief Trans Union failed to forward Plaintiff's dispute to Barclays or Macys.

47. Trans Union failed to conduct its own reinvestigation into Plaintiff's dispute letter.

48. Trans Union failed to respond to Plaintiff's dispute in any way.

49. Plaintiff's Trans Union credit report also does not state that the Barclays or Macys accounts are currently in dispute by Plaintiff.

50. Plaintiff should not be forced to move forward with credit opportunities until all errors on Plaintiff's Trans Union credit report are remedied.

51. Plaintiff has been damaged due to the Defendant's failure to investigate Plaintiff's dispute. In addition, Defendant's violations of the FCRA have caused Plaintiff to suffer embarrassment, humiliation, and emotional distress.

52. In addition to paying a higher interest rate on an auto loan, Plaintiff has lost opportunity to obtain credit at favorable rates. Plaintiff would like to refinance her mortgage, but can't until these errors are removed and interest rates continue to rise.

53. Plaintiff lost opportunity to obtain a credit card for travel points because of the subject derogatory accounts.

54. Plaintiff is unsure for how long Plaintiff's Trans Union credit report has had erroneous information in it. But, at a minimum, Trans Union allowed many other entities to access Plaintiff's Trans Union credit report that contains inaccurate information.

55. Plaintiff has suffered damages proximately caused by the conduct of Trans Union, including:

> i. Emotional distress, humiliation, guilt, stress, anxiety, damage to reputation, loss of financial independence, loss of self-esteem, embarrassment, frustration, anguish;

ii.      Time and expense of pulling/reviewing credit reports to verify the reporting of the inaccurate reporting;

iii.     Believing that the inaccurate reporting may continue to be reported inaccurately through no fault of Plaintiff's and have a chilling effect on Plaintiff's ability to obtain a mortgage;

iv.     Adverse information on Plaintiff's credit reports and a negative impact to Plaintiff's credit rating;

v.      An inability to improve Plaintiff's credit or debt-to-income ratio during the dispute process;

vi.     A lower credit score;

vii.    A debt-to-income ratio that does not accurately reflect Plaintiff's debts; and

viii.   Having to hire attorneys to combat the improper credit reporting.

**Count I**
**Violations of FCRA §§ 1681e(b) and 1681i**

56.     Plaintiff incorporates the preceding paragraphs as though fully set forth herein.

57.     A "consumer reporting agency" is defined by the FCRA as follows:

> any person which, for monetary fees, dues, or on a cooperative nonprofit basis, regularly engages in whole or in part in the practice of assembling or evaluating consumer credit information or other information on consumers for the purpose of furnishing consumer reports to third parties, and which uses any means or facility of interstate commerce for the purpose of preparing or furnishing consumer reports.

*See* 15 U.S.C. § 1681a(f).

58.     Trans Union is a consumer reporting agency as defined by Section 1681a(f) of the FCRA.

59.     Trans Union violated 15 U.S.C. § 1681e(b) by its conduct, acts, and omissions in failing to establish or to follow reasonable procedures to assure maximum possible accuracy of information concerning Plaintiff in the preparation and publication of Plaintiff's consumer reports

after receiving Plaintiff's dispute, failing to conduct any investigation, failing to note the dispute raised by Plaintiff, and disclosing Plaintiff's consumer reports to third parties.

60.     Trans Union's failure to forward Plaintiff's dispute to the subject furnishers prevented those furnishers from updating Plaintiff's accounts to include a dispute notation.

61.     Pursuant to 15 U.S.C. § 1681i(a)(1)(A) if the completeness or accuracy of any item of information contained in a consumer's file at Trans Union is disputed by the consumer, Trans Union must "conduct a reasonable reinvestigation to determine whether the disputed information is inaccurate and record the current status of the disputed information, or delete the item from the file…before the end of the 30-day period beginning on the date on which the agency receives notice of the dispute from the consumer."

62.     Pursuant to 15 U.S.C. § 1681i(a)(2)(A) Trans Union has 5-business days from receiving notice of a dispute from a consumer to send the dispute—with all relevant information—regarding the dispute to the company that provided any item of information in dispute.

63.     Pursuant to 15 U.S.C. § 1681i(a)(4) Trans Union must "review and consider all relevant information submitted by the consumer" when Trans Union conducts any reinvestigation.

64.     Pursuant to 15 U.S.C. § 1681i(a)(6) Trans Union shall provide written notice to a consumer of the results of a within 5-business days after the completion of the reinvestigation.

65.     Pursuant to 15 U.S.C. § 1681i(a)(8)(c) whenever a non-frivolous statement of a dispute is filed, Trans Union shall—in any subsequent consumer report containing the information in question—clearly note that it is disputed by the consumer.

66.     Plaintiff disputed inaccuracies contained in Plaintiff's Trans Union credit report.

67.     Trans Union received Plaintiff's dispute.

68.     Trans Union failed to forward Plaintiff's dispute to the appropriate entities who furnish the disputed information to Trans Union.

69.     Trans Union failed to conduct its own reinvestigations into Plaintiff's dispute.

70.     Trans Union failed to provide written notice to Plaintiff as to the results of its reinvestigations.

71.     If Trans Union concluded that Plaintiff's dispute was frivolous or irrelevant, Trans Union never provided notice to Plaintiff.

72.     Trans Union failed to update Plaintiff's credit report with a statement that the disputed accounts were being disputed by Plaintiff.

73.     Trans Union's conduct, action, and inaction as alleged herein was willful, or, in the alternative, negligent.

74.     Plaintiff suffered actual damages, embarrassment, humiliation, and emotional distress because of Trans Union's conduct, action, and inaction.

WHEREFORE, Plaintiff requests that this Honorable Court:

a.     Enter judgment in Plaintiff's favor and against Trans Union;
b.     Appropriate statutory penalties for each violation of the FCRA;
c.     Actual damages;
d.     Punitive damages;
e.     Reasonable attorney's fees and the costs of this litigation;
f.     Pre-judgment and post-judgment interest at the legal rate;
g.     Appropriate equitable relief, including the correction or deletion of the inaccurate or misleading reporting of Plaintiff's tradelines; and
h.     Such other relief as the Court deems equitable, just, and proper.

**Plaintiff demands a trial by jury on all issues so triable pursuant to Fed. R. Civ. P. 38.**

Dated: May 20, 2022

Respectfully submitted,

LUCIA ANA LOPEZ, plaintiff,

By: /s/James M. Smith

Richard J. Doherty (6226707)
James M. Smith (6285183)
Doherty Smith, LLC
9501 W. 144th Place
Suite 101
Orland Park, IL 60462
Phone: 708.645.8824
Fax: 312.319.4084
RDoherty@dohertysmith.com
JSmith@dohertysmith.com

## VERIFICATION

Plaintiff, Lucia Ana Lopez, declares as follows:

1.      I am the Plaintiff in this Verified Complaint.

2.      I reside in Florida.

3.      I have personal knowledge of myself and my activities, including those set forth in this Verified Complaint. If called to testify, I could and would testify competently and truthfully as to the matters stated in this Verified Complaint.

4.      I verify and affirm under penalty of perjury under the laws of the United States of America and the State of Florida that the factual averments in this Verified Complaint concerning myself and my activities are true and correct pursuant to 28 U.S.C. § 1746.

Executed on:___5/20/2022_____

*Lucia Lopez*
ID aWrQEcYC93YFy5VfeyUfDtQY

_____

/s/ Lucia Ana Lopez, Plaintiff

14

# eSignature Details

| | |
|---|---|
| **Signer ID:** | **aWrQEcYC93YFy5VfeyUfDtQY** |
| Signed by: | Lucia A. Lopez |
| Sent to email: | lopezla28@gmail.com |
| IP Address: | 99.177.66.223 |
| Signed at: | May 20 2022, 10:31 am CDT |

EXHIBIT A

# EXHIBIT A

Case CFPB Releases Report Detailing Consumer Complaint Response Deficiencies of the Big Three Credit Bureaus | Consumer Financi…

 **Consumer Financial Protection Bureau** (cfpb.gov/)

# CFPB Releases Report Detailing Consumer Complaint Response Deficiencies of the Big Three Credit Bureaus

Equifax, Experian, and TransUnion routinely failed to fully respond to consumers with errors

**JAN 05, 2022**

**WASHINGTON, D.C.** – A new analysis by the Consumer Financial Protection Bureau (CFPB) reveals how changes in complaint responses provided by nationwide consumer reporting companies resulted in fewer meaningful responses and less consumer relief. In 2021, Equifax, Experian, and TransUnion together reported relief in response to less than 2% of covered complaints, down from nearly 25% of covered complaints in 2019.

"America's credit reporting oligopoly has little incentive to treat consumers fairly when their credit reports have errors," said CFPB Director Rohit Chopra. "Today's report is further evidence of the serious harms stemming from their faulty financial surveillance business model."

Credit reporting plays a critical role in consumers' lives and has an enormous reach beyond consumer financial services. More than 200 million Americans have credit files, and lenders rely on this information to decide whether to approve loans and on what terms. Consumer reporting also informs decisions about employment, insurance, housing, and even essential utilities. For consumers, inaccuracies on credit reports drive up the cost of credit and severely limit opportunities, such as starting a small business or buying a new home.

Consumers submitted more than 700,000 complaints to the CFPB regarding Equifax, Experian and TransUnion from January 2020 through September 2021, which represented more than 50% of all complaints received by the agency for that period. Consumers submit more complaints about inaccurate information on their credit and consumer reports than about any other problem. Consumers most frequently assert that the inaccurate information belongs to someone else, and consumers often describe being victims of identity theft.

The CFPB found the three companies often failed to provide substantive responses, especially when they alleged the complaints were sent in by third parties. However, consumers can authorize third-party representatives to submit complaints on their behalf.

### Equifax, Experian, and TransUnion Fail to Meet Statutory Obligations

The Fair Credit Reporting Act (FCRA) requires Equifax, Experian, and TransUnion to conduct a review of complaints sent to them through the CFPB where consumers allege there is incomplete or inaccurate information in their consumer reports and the consumer appears to have previously attempted to fix the problem with the company. The companies must then report their determinations and actions for these covered complaints to the CFPB. Today's report shows:

- Equifax most often promised to open investigations and send the results to the consumers at later dates, but it would fail to provide the CFPB with the outcomes of the investigations.

- TransUnion made similar promises and frequently failed to provide the outcomes of investigations to the CFPB. It often stated it would take no action on complaints because it believed the complaints were submitted by third parties.

- For many complaints, Experian frequently stated it would take no action because it believed the complaints were submitted by third parties, however, it did respond to the remaining complaints with substantive responses.

### Medical Debt Mistakes

One of the main sources of consumer debt that can lead to consumer reporting inaccuracies and mistakes is medical bills. Consumers find that opaque pricing, the complex system of insurance coverage, and frequent delays in consumers finally receiving bills create an unnavigable quagmire and can make it harder to resolve billing errors. Accordingly, the CFPB's previous research shows consumers often struggle to even determine whether the debt belongs to them, and, if it does, whether the amount is accurate ⬇ (https://file s.consumerfinance.gov/f/201412_cfpb_reports_consumer_credit_medical-and-non-medical-collections.pdf).

Medical billing is just one example, but it highlights the ease with which errors, mistakes, and inaccuracies can occur, along with the financial consequences that follow.

### Key Findings

Overall, consumers describe a consumer reporting system that is not working for them and the serious consequences that follow when inaccurate

information is—and remains—on their consumer reports. Other key findings from today's report include:

- Equifax, Experian, and TransUnion relied heavily on template complaint responses instead of providing meaningful and thorough responses to consumers, despite having up to 60 calendar days to respond.

- Beginning in early 2020, Experian and TransUnion stopped providing substantive responses to consumers' complaints if they suspected that a third-party was involved in submitting a complaint.

- In many instances, Equifax and TransUnion promised to investigate but failed to provide the outcomes of their investigations to the CFPB and instead stated that they would forward the complaints to their "dispute channel."

Federal law requires Equifax, Experian, and TransUnion to conduct a review of certain complaints sent to them by the CFPB to determine whether all of their legal obligations have been met with respect to the subject matter of the complaint and then to report their determinations and actions to the CFPB. However, more than 50% of these complaints did not receive this review, based in part on their suspicions that the complaints were submitted by third parties. As a result, many consumers did not receive meaningful responses to complaints submitted through the CFPB complaint process. Overall, consumers describe feeling frustrated and stressed when the nationwide consumer reporting companies' automated processes for correcting inaccuracies do not work or when they do not get responses to their concerns. Consumers report that they spend time, energy, and money to try to correct inaccuracies.

Read the *Annual report of credit and consumer reporting complaints* (cfpb.go v/data-research/research-reports/annual-report-consumer-credit-reporting-co mplaints-analysis-of-complaint-responses-equifax-experian-transunion/).

To learn more about the complaint process, access our consumer complaint webpage. (https://www.consumerfinance.gov/complaint/)

Consumers having an issue with a consumer financial product or service can submit a complaint with the CFPB online (https://www.consumerfinance.gov/c omplaint/getting-started/) or by calling (855) 411-CFPB (2372).

### 

*The Consumer Financial Protection Bureau is a 21st century agency that implements and enforces Federal consumer financial law and ensures that markets for consumer financial products are fair, transparent, and competitive. For more information, visit consumerfinance.gov (cfpb.gov/).*

Case: 1:22-cv-02684 Document #: 1 Filed: 05/20/22 Page 21 of 21 PageID #:21

**PRESS INFORMATION**

If you want to republish the article or have questions about the content,
please contact the press office.

Go to press resources page (cfpb.gov/about-us/newsroom/press-resources/)

An official website of the United States government